2013 OK 7

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Lewis B. MOON, (a.k.a."L.B. Moon"), Respondent.**

SCBD Nos. 5847, 5932.

Supreme Court of Oklahoma.

Jan. 22, 2013.

Loraine Farabow, First Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for complainant.

John W. Coyle, III, Coyle Law Firm, Oklahoma City, OK, for respondent.

WATT, J.:

¶ 1 The respondent is before this Court for the second time in less than six months. The details of his first appearance are outlined in *State ex rel. Oklahoma Bar Ass'n v. Moon* (*Moon I*), 2012 OK 77, 295 P.3d 1. In that cause, the attorney was publicly censured, ordered to pay costs, and a deferred suspension of two years and one day was imposed during which time Moon was ordered to re-

frain from any and all use of alcohol and illegal drugs while participating in activities intended to ensure that he stay sober.[1]

¶ 2 The day after *Moon I* was promulgated, the Bar Association instituted a Rule 6.2A, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch 1, App. 1–A proceeding seeking the attorney's immediate interim suspension for actions occurring after the hearing before the trial panel in *Moon I* but before the cause was submitted to this Court.[2] It did so based on Moon's continued misconduct involving alcohol, firearms, lying, and outrageous behavior resulting in criminal misdemeanor charges being filed in Logan County. The charges are strikingly similar to those addressed in *Moon I, i.e.* impersonating a police officer, discharging a firearm, and disturbing the peace while intoxicated.[3]

¶ 3 In a separate instance, occurring after *Moon I* was promulgated, the attorney is alleged to have attempted to extort money from, assaulted, battered, and threatened a fellow member of the Bar and his family members with bodily harm while intoxicated. As a result, the Bar Association filed a notice

of Moon's having breached the terms of his deferred suspension.

¶ 4 Clear and convincing evidence[4] supports a determination that the respondent: failed to self-report an incident occurring during the pendency of disciplinary proceedings in which the attorney misrepresented himself as a police officer and was involved in discharging firearms while intoxicated; and, following the imposition of discipline, became intoxicated in a betting establishment, attempted to extort money from, assaulted, and battered a fellow attorney while threatening the attorney and his children with bodily harm. Although we have concerns with the manner in which the Bar Association handled the proceedings in relation to the matter arising before *Moon I* was submitted for our consideration, we disagree with the respondent's argument that he was denied due process during the hearing before the trial panel. In consideration of the facts and upon *de novo* review,[5] we hold that Lewis B. Moon should be disbarred, have his name removed from the roll of attorneys, and pay the costs of these proceedings in the amount of $2,415.79.[6]

---

1. In *State ex rel. Oklahoma Bar Ass'n v. Moon (Moon I)*, 2012 OK 77, ¶ 2, 295 P.3d 1, during the period of suspension, the attorney was ordered to: refrain from any and all use of alcohol or mind-altering substances; not partake of any illegal drugs; maintain participation in Alcoholics Anonymous, attending weekly meetings; sign and comply with conditions of a contract with Lawyers Helping Lawyers; complete any outpatient treatment program in which he was enrolled; and waive all questions of confidentiality permitting notification to the General Counsel of the Oklahoma Bar Association of any default in terms of probation or suspension.

2. Rule 6.2A(2), Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A providing:

   "**Immediate Interim Suspension.**
   (a) Upon filing of the verified complaint, the Court may issue an order directing the respondent to object and show cause within ten (10) days why such order of interim suspension should not be entered.
   (B) In the event such an objection is timely filed, the matter shall be set for hearing at the earliest possible time. Such hearing may be before the Court, any Justice thereof, or the Court may refer the matter to the Professional Responsibility Tribunal for hearing and recommendations."

3. We note that, unlike in *State ex rel. Oklahoma Bar Ass'n v. Moon (Moon I)*, see note 1, supra, there are no allegations that the attorney has been charged with operating a vehicle while under the influence. Nevertheless, Moon's conduct in the instant cause involved violation of the same disciplinary and professional rules as did his previous misconduct, *i.e.* Rule 8.4(b), Rules Governing Professional Conduct, 5 O.S.2011, Ch. 1, App. 3–A [criminal act reflecting adversely on a lawyer's honesty, trustworthiness, or fitness as an attorney] and Rule 1.3, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A [engaging in acts reflecting adversely upon the legal profession, whether in a professional capacity or otherwise.].

4. Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A; *State ex rel. Oklahoma Bar Ass'n v. Zimmerman*, 2012 OK 35, ¶ 15, 276 P.3d 1022.

5. *State ex rel. Oklahoma Bar Ass'n v. Townsend*, 2012 OK 44, ¶ 10, 277 P.3d 1269; *State ex rel. Oklahoma Bar Ass'n v. McCoy*, 2010 OK 67, ¶ 2, 240 P.3d 675; *State ex rel. Oklahoma Bar Ass'n v. Pacenza*, 2006 OK 23, ¶ 2, 136 P.3d 616.

6. Rule 6.13, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A; Rule 6.16, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App.1–A.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 5 In September of this year, Moon was publicly censured and given a deferred sentence of two years and one day. During the period of suspension, Moon was ordered to: refrain from any and all use of alcohol or mind-altering substances; not partake of any illegal drugs; maintain participation in Alcoholics Anonymous, attending weekly meetings; sign and comply with conditions of a contract with Lawyers Helping Lawyers; complete any outpatient treatment program in which he was enrolled; waive all questions of confidentiality permitting notification to the General Counsel of the Oklahoma Bar Association of any default in the terms of probation or deferred suspension; and pay costs of the proceeding.

¶ 6 *Moon I* was promulgated on September 18, 2012. The following day, the respondent, Oklahoma Bar Association (Bar Association), notified this Court that Moon had been criminally charged with an alcohol-related incident occurring on May 19, 2012, **some twenty-three (23) days after the hearing before the trial panel in *Moon I* and seventy-one (71) days before the cause was submitted to this Court.** It sought Moon's immediate suspension based on the attorney's continued misconduct involving alcohol, firearms, lying, and outrageous behavior.

¶ 7 An order issued on September 20th directing the attorney to show cause why he should not be immediately suspended. Moon filed a response on October 5, 2012 **denying that he had been drinking on May 19, 2012** or had identified himself as an ATF[7] agent. On October 15, 2012, we referred the suspension application to the trial panel for an expedited hearing with instructions that inquiry be made of both the attorney and the Bar Association as to **why this Court was not advised of the incident during the pendency of the prior disciplinary proceedings.** Before the trial panel hearing could take place, we were informed that the attorney participated in a second alcohol-related incident which might result in criminal charges. Allegedly, the attorney was involved in a drunken altercation at the Thunder Roadhouse in which he not only battered and threatened another attorney, James Pasquali (Pasquali), but also told him he could see that Pasquali's children were put at risk. At the same time, Moon sought to extort money from Pasquali. The trial panel was instructed to include the circumstances surrounding this second incident in its hearing scheduled for October 30, 2012. The day before the hearing convened, Moon was charged with one felony and two misdemeanors felonies arising from the occurrence at the Roadhouse: attempted extortion; threatening a violent act; and assault and battery.

¶ 8 When the hearing convened on October 30th, **Moon's counsel sought to circumvent the proceedings by stipulating that his client violated the terms of his suspended sentence, specifically by consuming alcohol on May 19th and October 7th, 2012.** Counsel also agreed to his client's interim suspension as contemplated in *Moon I*. He argued that proceeding with the hearing would deprive Moon of his constitutional rights to due process on grounds that he could not afford to fully participate in the hearing without revealing facts and strategies necessary to defense of the pending criminal charges. Asserting his client's Fifth Amendment rights against self-incrimination, the representative exercised his right not to cross-examine witnesses or to put on a defense. Following the hearing, Moon filed a stipulation to an immediate interim suspension of two years and one day. A suspension order issued from this Court on November 8, 2012.

¶ 9 On November 9th, the trial panel filed its report. Recognizing the threat of substantial and irreparable public harm created by Moon's actions, it recommended that the deferred suspension of two years and one day be revoked and that the attorney be disbarred. The trial panel also responded to our direction that it inquire of the Bar Association and of Moon's attorney why we were not notified of the first incident, which occurred during the pendency of *Moon I*. It

---

7. A federal agent with the United States Bureau of Alcohol, Tobacco, Firearms, Explosives. See, *Rita v. United States*, 551 U.S. 338, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007).

found that the Bar Association was not aware of the incident until August 16, 2012 and that Moon's counsel learned of the incident the following day. It was the trial panel's opinion that both counsel for the complainant and the respondent acted reasonably in not advising this Court of the incident until formal charges were filed.

¶ 10 We issued a briefing order on November 13, 2012 with an expectation that the briefing cycle would be completed by December 10, 2012. However, on the 7th, the respondent filed a motion for extension of time of twenty (20) days to file his brief-in-chief. Moon was granted a ten (10) day extension and the Bar Association was ordered to respond within a corresponding time period and to address issues of due process not considered in their brief in chief. The briefing cycle was completed on January 3, 2013 with the filing of the Bar Association's response brief.

## PRELIMINARY ISSUES

¶ 11 Before proceeding to consider the merits of the cause, we find it necessary to address two preliminary issues. The first is the failure of the Bar Association to immediately advise this Court of an incident in which Moon was involved during the period between the hearing in *Moon I* and the submission of that cause for our consideration. The second is the issue of due process raised by the respondent related to proceeding with the instant cause before criminal proceedings related to the two instances of misconduct could be prosecuted.

### ¶ 12 a) The Bar Association failed to keep this Court advised appropriately of the respondent's actions.

¶ 13 The hearing before the trial panel in *Moon I* took place on April 26, 2012. The matter was assigned for our consideration after completion of the briefing cycle on July 31st. The Bar Association first became aware of the Logan County incident on Thursday, August 16th. We harbor severe concerns about the manner in which the Bar Association handled what had to appear as a repeat offense by the same attorney of a matter pending before this Court.

¶ 14 In *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, 1997 OK 47, 937 P.2d 988, we emphasized that, in disciplinary matters involving repeat offenders, consideration of time-related offenses is necessary to avoid the waste of judicial resources, to provide a clear picture of the respondent's problems and shortcomings, and to ensure that the appropriate discipline is imposed. We noted that grouping of complaints provides a clearer picture of an attorney's problems and better enables the assessment of proper sanctions to achieve the goals of lawyer discipline, *i.e.* deterrence of others and protection of the public, of the courts, and of the legal profession.

¶ 15 This cause presents a prime example of a situation to which the Bar Association should have applied the principles outlined in *Wolfe*, supra. Had the Bar Association advised this Court of the attorney's "repeat performance" when it was first aware of the May incident, we could have ordered an accelerated procedure to consider the misconduct along with those matters presented to the trial panel in April. Rather than doing so, the Assistant General Counsel sought input from an array of other individuals and organizations.[8]

¶ 16 The Bar Association should have eased its concerns by filing a simple request with this Court asking for direction. Such an inquiry would not only have relieved the mind of the Bar's prosecutor but it would have given this Court the opportunity for a complete picture of the attorney's time-related misconduct and the notice necessary to ensure that all transgressions were dealt with in a timely manner while preserving the attorney's rights of due process.

¶ 17 The General Counsel's office has now been reminded of the principles outlined in

---

8. Transcript of hearing, October 30, 2012, Laraine Dillinder Farabow, responding to questions of the trial panel, indicated that she spoke with other attorneys at the Bar Association, with the prosecuting attorney in Logan County, and considered prior teachings of the former General Counsel. She also sent out inquiries to the National Organization of the Bar Counsel which forwarded some form of her inquiry to all disciplinary entities within the United States.

*Wolfe.* Therefore, we anticipate that these procedures will be followed in future disciplinary proceedings to avoid the confusion and waste of judicial resources occurring here.

### ¶ 18 b) Proceeding with the Bar Disciplinary Proceeding did not violate the attorney's rights to due process.

■ ¶ 19 Moon asserts that his due process rights were violated because he was placed in the position of either having to defend his law license or his liberty. His argument is based on the contention that his due process rights were violated by proceeding with the disciplinary matter before all criminal charges had been resolved. The attorney argues that he could only defend against discipline by waiving his Fifth Amendment right against self incrimination and by revealing defenses to criminal charges through conduct cross examination. The Bar Association counters stating that because Moon was never called upon to testify and there is no indication that any discipline imposed will be based on his assertion of the privilege, his Fifth Amendment rights were never at issue nor were they violated. Furthermore, they insist Moon was accorded all the process to which he was entitled. We agree with the Bar Association's position.

¶ 20 The only citation to authority contained in Moon's answer brief filed on December 18, 2012, is *Spevack v. Klein,* 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967). The attorney relies on *Spevack* for the proposition that the Fifth Amendment applies in lawyer disciplinary proceedings and that an attorney may not be disbarred for asserting the privilege. Likewise, both the disciplinary rules and our jurisprudence, protected Moon from having to undergo examination on matters which might tend to incriminate him.[9] Furthermore, there is no indication that the trial panel's recommendation for discipline was, in any way, based on the respondent's assertion of the privilege.[10] Finally, the respondent can rest assured that the discipline imposed arises solely from his actions demonstrated by the facts proven by clear and convincing evidence.[11]

■ ¶ 21 Our disciplinary rules specifically contemplate that grievances may be prosecuted despite pending criminal or civil litigation.[12] Moon was given notice of the proceedings and of the charges filed against him. He was provided with ample opportunity to present a defense but chose not to do so. In objecting to the imposition of an interim suspension, Moon touted constitutional protections of the presumption of innocence and his Fifth Amendment right to remain silent. The respondent initially denied impersonating a police officer and consuming alcohol on the evening of May 19, 2012. **Moon requested the very hearing in which he refused to participate.**[13] The respondent was represented by counsel and had every opportunity to defend himself, call witnesses, and confront the individuals testifying against him. Determinations reached herein cannot be

9. Rule 6.11(d), Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A providing in pertinent part:

" ... [T]he respondent may not decline to answer any relevant question unless he personally states that his answer thereto might disclose matters that are privileged or that would tend to incriminate him or show him to be guilty of any act or offense that would be grounds for discipline."
*State ex rel. Oklahoma Bar Ass'n v. Wilcox,* see note 10, infra.

10. See, *State ex rel. Oklahoma Bar Ass'n v. Wilcox,* 1997 OK 87, ¶ 11, 942 P.2d 205.

11. Rule 6.12, Rules Governing Disciplinary Proceedings, see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. Zimmerman,* see note 4, supra.

12. Rule 5.6, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 1–A providing:

"Processing of grievances shall not be deferred or abated because of substantial similarity to the material allegations of pending criminal or civil litigation, or administrative proceedings, unless authorized by the Commission in its discretion, for good cause shown."

13. Respondent's Objection to Complainant's Verified Complaint and Application for Immediate Interim Suspension pursuant to Rule 6 and 6.2A, RGDP, filed on October 5, 2012, ¶¶ 5 and 11, and in the prayer for relief providing:

"WHEREFORE, Respondent, Lewis B. Moon, prays for a hearing pursuant to Rule 6.2A(2)(b) on the allegations in the Complaint and that the Application for Interim Suspension be denied."

considered conclusive on any criminal prosecution.[14]

¶ 22 Moon's arguments that his treatment before the trial panel violated his constitutional rights is unconvincing. The attorney was denied neither his right to invoke the right against self incrimination nor any process to which he was due.

## JURISDICTION AND STANDARD OF REVIEW

¶ 23 It is this Court's nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law. The duty is vested solely in this department of government.[15] We bear the ultimate responsibility for deciding whether misconduct has occurred and, if so, what discipline is warranted. Our determinations are made de novo.[16] Neither the finding of facts of the trial panel nor its view of the evidence or the credibility of witnesses bind this Court. The recommendation is merely advisory.[17] The same is true when the parties stipulate to misconduct and a recommendation for discipline.[18] Before this Court will discipline an errant attorney, misconduct must be demonstrated by clear and convincing evidence.[19] To make this determination, we must be presented with a record sufficient to permit an independent, on-the-record review for the crafting of appropriate discipline.[20]

¶ 24 Despite Moon's refusal to participate in the disciplinary proceedings in the instant cause, the record submitted is sufficient for this Court to make the required determinations. Furthermore, the issue of whether Moon was drinking alcohol during the two instances leading to criminal charges is unquestioned. Moon's counsel stipulated to the same and to his client's being subject to a two year and one day suspension under the circumstances of the two pending criminal cases.[21]

14. There are three standards (or levels) of proof, i.e. beyond a reasonable doubt, clear and convincing, and preponderance of the evidence. The intermediate standard of clear and convincing evidence, which serves to protect important individual interests in civil cases, reduces the risk of error by increasing the plaintiff's burden of persuasion. It is distinguishable from the higher, beyond-a-reasonable-doubt standard which is designed to exclude as nearly as possible the likelihood of an erroneous judgment and from the lower, preponderance-of-the-evidence standard, which requires the litigants to share the risk of error in a roughly equal fashion. *State ex rel. Oklahoma Bar Ass'n v. Eakin*, 1995 OK 106, fn. 21, 914 P.2d 644. In a criminal prosecution, it is the State's burden to prove guilt beyond a reasonable doubt. *State v. Hooley*, 2012 OK CR 3, ¶ 24, 269 P.3d 949; *Johnson v. State*, 2004 OK CR 23, ¶ 11, 93 P.3d 41; *Taylor v. State*, 1949 OK CR ——, 90 Okla.Crim. 169, 212 P.2d 164. In a bar disciplinary proceeding, the burden of proof is by clear and convincing evidence.

15. Title 5 O.S.2011 § 13; *State ex rel. Oklahoma Bar Ass'n v. Farrant*, 1994 OK 13, ¶ 13, 867 P.2d 1279; *Tweedy v. Oklahoma Bar Ass'n*, 1981 OK 12, ¶ 4, 624 P.2d 1049.

16. *State ex rel. Oklahoma Bar Ass'n v. Combs*, 2008 OK 96, ¶ 11, 202 P.3d 830; *State ex rel. Oklahoma Bar Ass'n v. Pacenza*, see note 5, supra; *State ex rel. Oklahoma Bar Ass'n v. Garrett*, 2005 OK 91, ¶ 17, 127 P.3d 600.

17. Rule 6.15, Rules Governing Disciplinary Proceedings, 5 O.S.2011, Ch. 1, App. 10–A; *State ex rel. Oklahoma Bar Ass'n v. Besly*, 2006 OK 18, ¶ 2, 136 P.3d 590; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2003 OK 56, ¶ 2, 71 P.3d 18.

18. *State ex rel. Oklahoma Bar Ass'n v. Combs*, see note 16, supra; *State ex rel. Oklahoma Bar Ass'n v. Besly*, see note 17, supra; *State ex rel. Oklahoma Bar Ass'n v. McGee*, 2002 OK 32, ¶ 20, 48 P.3d 787.

19. *State ex rel. Oklahoma Bar Ass'n v. Whitebook*, 2010 OK 72, ¶ 3, 242 P.3d 517; *State ex rel. Oklahoma Bar Ass'n v. Rogers*, 2006 OK 54, ¶ 9, 142 P.3d 428.

20. *State ex rel. Oklahoma Bar Ass'n v. Schraeder*, 2002 OK 51, ¶ 27, 51 P.3d 570; *State ex rel. Oklahoma Bar Ass'n v. Perceful*, 1990 OK 72, ¶ 5, 796 P.2d 627.

21. Transcript of Hearing, October 30, 2012, John W. Coyle, III stating at pages 8–9 providing in pertinent part:

" . . . And on that same note I will say now and admit—more or less to cut to the chase, admit that LB Moon was drinking on the nights in question, on—if I may have just a moment. We will agree particularly that he has violated the terms of the suspended sentence issued by the Supreme Court, and specifically that in the September 18th order they ordered that LB Moon was not to consume alcohol. We will stipulate and agree that on—let me get the date here—that on the date of Sunday, October 7th, 2012, LB Moon consumed alcohol at a location

### Incident Occurring During Pendency of *Moon I* May 2012, Logan County

¶ 25 Belinda and James Roe live with their children in a home located in Logan County. At approximately 6:00 p.m. on May 19, 2012, they began hearing machine gun fire coming from an adjacent residence. When the shooting had been going on for one to two hours, the Roes called the property owner. They were advised that it was the renter and his attorney who were doing the shooting. At 10:00 p.m., the Roes decided to go next door and ask that the shooting cease as the couple and their children were getting ready to retire for the night.

¶ 26 When the Roes pulled up, two obviously intoxicated men approached the truck.

> known as the Thunder Roadhouse. I will also stipulate and agree that prior to the Court's opinion, in the incident in Logan County, Oklahoma, that occurred on May 19th, 2012, that LB Moon consumed alcohol on that occasion as well ... We agree with the suspension and we don't believe that further evidence is necessary in the hearing...."

22. Although Moon contends he never identified himself as an Alcohol, Tobacco, and Firearms (ATF) agent, there is no question that he was the individual encountered by the Roes that evening.

> Transcript, October 30, 2012, Belinda Roe testifying in pertinent part at pp. 57–59:
> "... Q. And on or about May 19th of this year, was there anything unusual that happened that evening?
> A. Well, there was machine gun fire that had started around ... 6:00ish probably.... My husband is like, 'You know what, I'm just going to go over and ask them if they'll please stop shooting.' We were getting ready for bed. And so we went over there and pulled up and two men came to the truck. One was—they were both really drunk. One was really friendly, and he was the shorter man. And, you know, he was like, 'Are you ready to, you know, F'ing party?' And we're like—my husband is like, 'No. If you could please stop shooting. We're trying to get the kids to bed. We're trying to go to bed. If you all would just please stop shooting.' So then the taller man, he was real quiet. And then he came up to the window and he said—he didn't say anything; he was like silent for a little bit. And then he stuck his hand out to may husband and said I'm LB Moon or LB Boone—I mean, it was hard to understand him because he was drunk. And he said, 'I'm with the ATF.' ..."
> Transcript, October 30, 2012, James Wesley Roe testifying in pertinent part at p. 68:
> "... Q. Did you understand him to say Moon or did you think that he might have said Boone?

The taller of the two introduced himself either as L.B. Moon or L.B. Boone. His speech was so slurred that he was difficult to understand. This same man identified himself as being "with the ATF" [22] calling himself an "agent." [23] The Roes left after being assured that the shooting would stop. However, they had no more than arrived home when the automatic weapon began discharging again at which time they called 9-1-1. Because of concerns regarding an extremely intoxicated individual representing himself as an ATF agent while discharging an automatic weapon, the Roes called Washington, D.C. that evening to verify Moon's status. They were told that there was no ATF agent by the name of L.B. Moon.[24] When the Roes

> A. I understood him to say Moon....
> Q. And do you recognize the person who identified himself to you that evening?
> A. Yeah.
> Q. Can you point him out?
> A. (Indicating)....
> MR. COLLINS: The record will reflect that Mr. Roe has identified the Respondent.

23. Transcript, October 30, 2012, James Wesley Roe testifying in pertinent part at p. 67:

> " ... And Lewis B. Moon introduced himself to me as an ATF agent...."

24. Transcript, October 30, 2012, James Wesley Roe testifying in pertinent part at pp. 71–72:

> " ... Q. And you say he identified himself as being with the ATF?
> A. Yes.
> Q. Did you follow up on that to see if there was an ATF agent named LB Moon?
> A. I did. I called the number for the ATF that night, and a call center like in D.C. picked it up and they checked the records, and, you know, there was no—they don't have any ATF agents by that name.
> Q. Why did you take that extra effort, sir, to contact ATF?
> A. Because I felt like it was a pretty serious thing. You know, in this day and age, you know, to represent yourself as an ATF agent or an FBI agent or as a police officer, something like that, it's pretty serious, you know.
> Q. Did it concern you at all that this person representing himself as a possible ATF agent was, in your words, extremely intoxicated and shooting?
> A. Yeah. You know, it's—it was—it's dark, you know. And, you know, just the combination of alcohol and firearms don't go well together, and you throw in the darkness and, you know, it's just—it was just a dangerous situation...."

went to the Logan County Sheriff's Department to give their statements, a deputy sheriff made similar inquiries and received the same information, there was no ATF Agent named either L.B. Boone or L.B. Moon.[25]

¶ 27 Two deputy sheriffs were sent out to investigate the incident by the Logan County Sheriff's Office in response to the Roes' 9–1–1 call. One officer testified that he heard shots as he approached the property from at least two miles away and that when he arrived there were as many as two hundred brass casings lying on the ground.[26] When Moon exited the residence on the property and approached the deputy sheriff, he was agitated, cursing, and threatening to sue the officer and the sheriff's department. Although he did not identify himself as an ATF agent to the deputy sheriff, he did say he would see that he and his employer appeared on CNN and the front page of the newspaper.[27] During this occurrence, Moon

25. Transcript, October 30, 2012, Richard Stephens testifying in pertinent part at pp. 89–91:

" ... Q. And what specifically was the nature of their complaint on the 21st since that was after the May 19th incident?
A. They came in because they were concerned because one of the individuals at the site on the 19th had identified himself as an alcohol, tobacco and firearms agent to them while he appeared to be intoxicated and they had heard lots of gunfire in the area where he had been at. They said that they had contacted the alcohol, tobacco and firearms to decide if he was or was not an employee there and had been [sic] that he wasn't, and they thought that we should investigate that. . . .
Q. What did you proceed to do?
A. I made contact with the department at alcohol, tobacco and firearms, specifically Agent Sam Ford. I've interacted with him on several occasions, and I asked if they employed a person by the name of Boone which is what the person—the Roes had thought he had been identified as, as a person named Boone. And he said that they did not. Through the investigation with Mr. Dodd, I pulled up his previous case and uncovered the fact that he was represented by an attorney named LB Moon, and I thought that that was a pretty close connection to the name they had heard. I pulled up a photograph of Mr. Moon and Mr. Dodd and showed those photographs to Deputy Haga to determine if those are the individuals he had interacted with on the 19th, and he clearly and positively identified them as the individuals he had dealt with.
Q. Based upon Deputy Haga's identification and your confirmation with ATF that they did not have an employee by the name of LB Moon or Boone, what did you proceed to do then, sir?
A. I presented charges to the district attorney's office for false identification as a peace officer and disturbing the peace. . . ."

26. Transcript, October 30, 2012, Steven Haga testifying in pertinent part at pp. 75–76:

" ... Q. When you were proceeding over there, did you hear or observe any shots yourself?
A. Yeah. Yes. I was traveling down Camp, which is a couple of miles away from the—or where the Rps were calling from, and I heard several shots. It sounded like a fully-automatic rifle coming to the south of where I was.
Q. And that was about two miles away?
A. Uh-huh.
Q. When you actually arrived at the property owned by Mr. Markle, did you observe any people shooting or—
A. No. There was no one outside shooting, but I observed several brass casings on the ground.
Q. Several? A couple of dozen or more?
A. A couple hundred maybe. . . ."

27. Transcript, October 30, 2012, Steven Haga testifying in pertinent part at pp. 80–81:

" ... Q. And what proceeded outside between you and Mr. Moon?
A. I tried to talk to Mr. Moon and ask him, you know, if anybody had been firing any weapons. And he said no and was very agitated that I was on the property and started cursing at me and threatened to sue me and the sheriff's office for being on the property saying we had no right to be there.
Q. Was he saying this in a conversational tone? Was he—
A. No. He was highly agitated. . . .
Q. And at some point did Mr. Moon make some comment about putting you all on CNN?
A. Yes. He said he was going to sue us and the sheriff's office and that we would be on the front page of the newspaper. . . ."
Transcript, October 30, 2012, Gregory Randolph testifying in pertinent part at pp. 85–87:
" ... Q. What did you hear?
A. I heard him saying that he could sue us, we didn't understand who we were dealing with, that we had no business being on private property, that he would make us both famous and we would be on CNN in the morning if that's the way we chose to go. . . .
Q. Was he engaging in a threatening manner?
A. I believe so, yes. I was actually surprised that we got out of there without any type of physical altercation. . . .
Q. And what signs of intoxication did you observe, sir?

appeared to be highly intoxicated. The attorney: smelled strongly of alcohol; was unsteady on his feet, swaying back and forth; and had slurred speech.[28]

¶ 28 The incident occurred on May 19th, resulting in charges being filed on September 18, 2012.[29] **Although the Bar Association was aware of the incident in August,[30] it did not report the same to this Court. Moon's counsel was not advised of the event before then as his client had not revealed it to him.**

### Incident Occurring After *Moon I* was Promulgated October 2012, Oklahoma County

¶ 29 James J. Pasquali (Pasquali) is an attorney practicing primarily in Oklahoma County. On October 7, 2012, he decided to stop by a bar and off-track betting establishment, Thunder Roadhouse (Roadhouse). When he entered the Roadhouse, Pasquali recognized several people, one of which was Moon, who appeared to have been drinking. After greeting Moon, Pasquali offered to buy him a drink at which point Moon asked for a vodka and Red Bull.[31] Pasquali then walked away from Moon and Moon's companion, James Randall Dodd (Dodd).

¶ 30 Some time later, Dodd and Moon joined Pasquali. Dodd confronted Pasquali telling him that he had a "problem" with him and demanding the return of a fee of one-thousand dollars ($1,000.00) paid to Pasquali for the representation of Dodd's son. At this point, Moon entered the conversation in an extremely aggressive and threatening manner. He threatened to kill Pasquali and have his daughters raped and killed. Moon told Pasquali that if he went to the police, he would kill him. He grabbed Pasquali's collar and threatened to run a pen through his neck and his remains through a shredder.[32] The

A. Slurred speech, unsteady on his feet, and just the mannerisms that are unbecoming to a normal person while they're engaging with law enforcement.
Q. Sure. Did he ever, at anytime in your presence, identify himself as an ATF agent?
A. He said he was with the ATF and had every right to be doing what he was doing....
Q. You just heard him making threats to sue?
A. Yes, ma'am...."

28. Transcript, October 30, 2012, Steven Haga testifying in pertinent part at pp. 79–80:

" ... Q. Could you notice any type of odor of alcohol about [Moon's] person?
A. Yes.
Q. Was it strong, mild?
A. It was strong.
Q. Did you notice any other signs of intoxication?
A. Yeah. He was swaying back and forth, unsteady on his feet and slurred speech.
Q. On a scale from 1 to 10, sir, 10 being drunk comatose, how would you rate Mr. Moon's level of intoxication on that evening?
A. Probably an 8...."

29. The bartender at the Thunder Roadhouse Cafe testified that Moon regularly consumed alcohol at the Roadhouse for a period following September 18th. Transcript, October 30, 2012, Emily Allyce Foltz, testifying in pertinent part at pp. 48–49:

" ... Q. Would you-would it be your testimony that you have seen Mr. Moon consume alcohol and act in such a manner since September 18th of this year?
A. Yes, ma'am.

Q. Can you estimate how many times you may have seen him in your establishment since that time?
... A. I would say—there for awhile he was coming in on a regular basis, so I would say probably over 10 to 15 times...."

30. Transcript, October 30, 2012, Loraine Farrobow testifying in pertinent part at pp. 107–08:

" ... As you can see from this series of e-mails, the first time the Bar was made aware of any incident was when David Prater came to the Bar, to my office specifically, on August 16th, at about a quarter to 5:00 that day and advised me that he had heard some information that was concerning to him that was under review by the Logal County district attorney's office...."

31. Transcript, October 30, 2012, James J. Pasquali testifying in pertinent part at pp. 23–24:
:"Q. Okay. Did you observe whether or not Mr. Moon was drinking any type of alcoholic beverage?
A. He appeared to have been drinking ... And I said 'Let me buy you all a couple of drinks. I'm going to go back in there and watch the races'. And Mr. Moon asked for a vodka and Red Bull and Mr. Dodd known as Cowboy wanted a beer, a Bud Light I believe...."

32. Transcript, October 30, 2012, James J. Pasquali testifying in pertinent part at pp. 29–34:

" ... Q. What did [Moon] say?
A. .... And Mr. Moon began to become extremely verbally abusive and threatening. And he said, 'You're going to pay him his money

matter only began to diffuse when the bartender approached the group and asked if everything was all right.[33] Pasquali was able then to leave the Roadhouse.

¶ 31 Pasquali, in shock at Moon's treatment and scared for himself and his family, called his law partner who advised him to contact the police. He did so along with the Oklahoma County District Attorney. When the police arrived, Moon and Dodd had left the premises. On October 29, 2012, Moon was charged in Oklahoma County with at-

tempted extortion, threatening to perform an act of violence, and assault and battery.

## ENHANCEMENT, MITIGATION, AND APPROPRIATE DISCIPLINE

■ ¶ 32 The trial panel recommended Moon be disbarred and his name stricken from the roll of attorneys. The Bar Association agrees and requests the payment of costs in prosecuting the proceeding. We are the ultimate decision makers concerning attorney discipline and are not bound by the

back.' And he began to curse me. He said—he just said all this stuff like—he started threatening to kill me, and he stated, 'You've got daughters. You're going to pay him his fucking money back.' ... and he said you've got—and then he said 'Do you want me to kill you? You're not shit. I'll break you neck. You're going to pay him his fucking money back.' And then he said, 'You've got daughters.' And I said, ''yeah, LB, I've got daughters.' And he goes, 'You've got pretty daughters, don't you?'... He said ...' I'll have five niggers rape your daughters—' he said, 'I'll have five niggers come down.' He said, 'They'll rape your daughter and they'll murder her.' And he said, 'You know what, I'll have them rape you and murder you too.' And about that point I said, 'You know, I've heard enough,' and I went to stand up from the table and he grabbed a hold of my collar and jerked me back down. And he kept on and he kept on. He kept saying, 'All right. Do you want your daughters to die?' 'If you want your daughter to die.' He had referred to daughters earlier. Then he said, 'Do you want your daughter to die?' And he'd take a pen in his hand and he'd grab me by the collar and pen in his hand and he'd grab me by my collar and he's sit there and go, 'I'll run this pen right through your fucking throat.' He said, 'I'll put you through a shredder.' He said, 'Nobody will ever find anything of you except for your tooth.' He said—and then—and then he went to saying that if I went to the police about this deal ... this went on and on and on and on, and I kept trying to get up.... Every time I tried to get up he'd grab me with his left hand I believe and he'd jerk me back down in the chair and pull me down He'd pull me real close to his face and on several of those occasions he had his rocks glass ... I felt like he was very dangerous and I felt very much in fear of my life and I felt like very much like I couldn't get away from the situation....
Q. At some point did someone from the Bar intercede?
A. Yeah. Emily walked up. She's the bartender. And she walked up and she said, 'Is everything okay over here?' ... And LB said,

'Oh, yeah, everything is fine.' And he'd pat me like that on the (indicating). And he said 'Everything is fine, Honey.... I could not ever imagine dreaming up more vulgar, horrible, cruel things, hateful things, threatening things to say about a person or his family.
Q. Were you able to leave the area and Mr. Moon's presence?
A. Finally, yes.''

33. Transcript of proceedings, October 30, 2012, Emily Allyce Foltz testifying in pertinent part at pp. 51–52:

'' ... Q. Okay. Do you recall an incident that occurred at Thunder Roadhouse on about October 7th involving Mr. Moon and an attorney by the name of James Pasquali?
A. Yes ma'am.
Q. What did you observe that evening.
A. From the beginning ... LB Moon came in with Randy, also known as Cowboy. And they sat down and kept to themselves and just ate their lunch and started drinking. And then they went into the game room and they started playing pool. And once they started doing that with other people it got to the point where the other people walked away because they were starting to feel threatened. And so, meanwhile, James had came in and he was keeping to himself and drinking Dr. Pepper and just watching the horses. And after the other guys had left the game room, Randy and LB Moon came in to the main room where Pasquali was and sat down with him, and I noticed that they were starting to kind of get into it with him a little bit.
Q. What do you mean by ''get into it''?
A. It just looked like they were arguing with him and it just didn't look right.... So I approached them and asked if everything was going okay and I put my hand on LB Moon and said, in a joking manner, you know, 'You need to play nice'.... And he had grabbed Pasquali by the shirt and he pulled him in and he said, 'Everything is fine, everything is fine'.... So I went to walk off and turned around and he had done it again and put him almost into a headlock.... James Pasquali

trial panel's findings, recommendations, and conclusions.[34]

¶ 33 It is significant that this second occasion for discipline involves the same type of misconduct as that which was encompassed within the prior offenses—alcohol abuse, discharging of firearms, and Moon's misrepresentation of himself as an officer of the law. Perhaps more concerning is the fact that the attorney's actions seem to have escalated to the point of engaging in a physical assault and battery while attempting to extort money from a fellow attorney, and in threatening to do much worse, *i.e.* saying he would "kill" the attorney and stating he could arrange an assault on the attorney's family, including the rape of his daughters.

¶ 34 Incredibly, Moon argues that, in imposing discipline, we should consider leniency based upon his history of alcoholism. The attorney experienced "leniency" when he was publicly censured and given a deferred suspension in *Moon I*. Today, we must consider Moon's patterns of misconduct as a factor in tailoring the appropriate discipline for the respondent's misdeeds.[35] This Court takes seriously the indifference of attorneys to their wrongdoing.[36]

¶ 35 Even before the first case could be submitted to this Court, Moon was drinking and handling firearms while intoxicated. After the suspension issued, he battered another attorney and attempted to extort money

while threatening the attorney and his family. It is perfectly clear that Moon has little regard for himself, no interest in how his actions affect the public perception of the legal profession as a whole, and no respect for this Court nor understanding of the leniency shown to him in *Moon I*.

¶ 36 Moon has gone well beyond violating his suspended sentence by repeatedly abusing alcohol. There is clear and convincing evidence[37] that Moon was abusing alcohol shortly after he testified in the original disciplinary proceeding and that he continued imbibing after the cause was finally submitted to the Court. He not only has engaged in the activity on more than one occasion, he did so while his original disciplinary proceeding was pending before this Court. At the hearing before the trial panel in *Moon I*, the attorney specifically stated, under oath, the he would "definitely" not represent himself as an officer of the law in the future.[38] Yet, it is clear that Moon did so when he stated he was with the ATF at the time of the first incident. Apparently, he did not "self-report" his breach of the conditions of his original discipline to: his attorney, Lawyers Helping Lawyers, the Bar Association, or this Court. Having given Moon the benefit of the doubt in *Moon I*, we now have no confidence in his truthfulness, integrity, or commitment to sobriety. The attorney is an embarrassment to the legal profession, the Bar Association, and this Court. He has undermined public confidence in his fellow legal practitioners.

---

jumped up and walked out of the restaurant...."

**34.** *State ex rel. Oklahoma Bar Ass'n v. Blackburn*, 1999 OK 17, ¶ 30, 976 P.2d 551; *State ex rel. Oklahoma Bar Ass'n v. Holden*, 1995 OK 25, 895 P.2d 707; *State ex rel. Oklahoma Bar Ass'n v. McCoy*, 1996 OK 27, ¶ 14, 912 P.2d 856.

**35.** *State ex rel. Oklahoma Bar Ass'n v. Minter*, 2001 OK 69, 37 P.3d 763; *State ex rel. Oklahoma Bar Ass'n v. Kessler*, 1991 OK 81, ¶ 16, 818 P.2d 463.

**36.** *State ex rel. Oklahoma Bar Ass'n v. Busch*, 1996 OK 38, 919 P. 2d 1114; *State ex rel. Oklahoma Bar Ass'n v. Butler*, 1995 OK 88, 903 P.2d 872; *State ex rel. Oklahoma Bar Ass'n·v. Wolfe*, 1993 OK 84, ¶ 18, 864 P.2d 335. See also, Commentary, Rule 8.4, Rules Governing Professional Conduct, 5 O.S.2011, Ch. 11, App. 3-A, providing in pertinent part:

" ... A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation...."

**37.** Rule 6.12, Rules Governing Disciplinary Proceedings, see note 4, supra; *State ex rel. Oklahoma Bar Ass'n v. Zimmerman*, see note 4, supra.

**38.** Transcript or proceedings, April 26, 2012, Lewis B. Moon testifying in pertinent part at pp. 35–36:

" ... Q In retrospect now though, having-going through this Bar disciplinary proceeding, having been through the felony charges being filed for impersonating an officer, the video, throwing out names, people you know, is that something that you can assure this Trial Panel that, and more importantly the Oklahoma Supreme Court, that you're going to refrain from doing in the future if—if, God forbid, you were stopped ever again?

¶ 37 It is apparent that our leniency in *Moon I*, in which we allowed the attorney to continue the practice of law with the promise of a lengthy suspension should he violate the terms imposed concerning alcohol use, did little to impress Moon with the necessity of compliance if he sought to continue practicing law. Therefore, we must deliver discipline sufficient to persuade the attorney that such conduct will not be tolerated.[39] Currently, the attorney stands interim suspended from the practice of law pending resolution of the instant cause. When previous sanctions have failed to correct errant conduct, this Court, in carrying out its duty to protect the public, has no choice but to substantially increase the severity of the sanction. Anything less and we would be deserting our constitutionally-vested power as overseer of the legal profession.[40]

¶ 38 Although mitigating circumstances may be considered in evaluating both the attorney's conduct and in assessing the appropriate discipline,[41] the attorney's failure to participate in the hearing before the trial panel leaves us with little that can be said in mitigation. Furthermore, Moon has been charged with more than misuse of alcohol which would have been sufficient for his immediate suspension for a period of two years and one day under the terms of *Moon I*. Here, the clear and convincing evidence supports the allegations that he: engaged in shooting firearms while intoxicated; identified himself as a federal ATF agent; attempted to extort money from and assaulted and battered a fellow lawyer; threatened the same attorney with death; and, even more reprehensible, told his fellow Bar member that he could have his daughter raped. We are convinced that vindication of the legitimate interests served by Oklahoma's bar dis-

ciplinary regime requires imposition of the most severe of sanctions, disbarment, together with the payment of costs of $2,415.79.

### CONCLUSION

¶ 39 Testimony in *Moon I* made it clear that the respondent had, in the past, served well a contingent of clients suffering legal problems. Several colleagues and Judges before whom he appeared felt certain that Moon had conquered his demons. We were of the same opinion. However, Moon admits: having "fell off the wagon with a thud;" drinking alcohol on May 19, 2012 and October 7, 2012; and having engaged in profane and insulting behavior while intoxicated.[42]

¶ 40 The respondent's actions in May and September of last year make it clear that allowing him to further practice law would be damaging to the public perception of the legal profession as a whole. The rule of law requires substantial disciplinary action. Due to his history with alcohol, guns, lying, and outrageous behavior and in order to protect the public and uphold the standards of the legal profession, the respondent, Lewis B. Moon, is ordered disbarred and is further directed to pay costs of the proceedings in the amount of $2,415.79 within thirty days of the date this opinion becomes final.

**RESPONDENT DISBARRED AND ORDERED TO PAY COSTS OF THE PROCEEDING.**

COLBERT, C.J., REIF, V.C.J., KAUGER, WATT, WINCHESTER, TAYLOR, COMBS, GURICH, JJ., concur.

EDMONDSON, J., concurs in result.

'A  Oh, yeah. Definitely. Yes...."

**39.** *State ex rel. Oklahoma Bar Ass'n v. Pacenza,* see note 5, supra; *State ex rel. Oklahoma Bar Ass'n v. McLain,* 2003 OK 15, ¶ 23, 65 P.3d 281; *State ex rel. Oklahoma Bar Ass'n v. Miskovsky,* 1997 OK 55, ¶ 15, 938 P.2d 744.

**40.** *State ex rel. Oklahoma Bar Ass'n v. Pacenza,* see note 5, supra; *State ex rel. Oklahoma Bar Ass'n v. Benefield,* 2005 OK 75, ¶ 31, 125 P.3d 1191.

**41.** *State ex rel. Oklahoma Bar Ass'n v. Southern,* 2000 OK 88, ¶ 35, 15 P.3d 1; *State ex rel. Oklahoma Bar Ass'n v. Taylor,* see note 17, supra.

**42.** Respondent's Answer Brief, p. 17, filed on December 18, 2012. Admissions in a brief may be regarded as a supplement to the appellate record. *Oklahoma Corrections Professional Ass'n, Inc. v. Jackson,* 2012 OK 53, fn. 6, 280 P.3d 959; *Woods v. Prestwick House, Inc.,* 2011 OK 9, fn. 16, 247 P.3d 1183, *White v. Heng Ly Lim,* 2009 OK 79, fn. 10, 224 P.3d 679.