**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Darril Lonnie HOLDEN, Respondent.**

**SCBD No. 3962.**

Supreme Court of Oklahoma.

March 21, 1995.

John E. Douglas, Asst. Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for complainant.

William C. Devinney and David B. Autry, Oklahoma City, for respondent.

KAUGER, Vice Chief Justice:

The complainant, Oklahoma Bar Association (Bar Association), charged the respondent, Darril Lonnie Holden (Holden/attorney), with a single count of misconduct—advising his client, Steven D. DeVore (DeVore/father), to remove his minor child from Oklahoma in violation of a court order. We find that the Bar Association established by clear and convincing evidence [1] that Holden advised his client to remove a child from Oklahoma in violation of a court order.[2] The conduct warrants a one year suspension and the payment of costs in the amount of $5,333.39.[3]

1. Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A provides in pertinent part:

"... (c) To warrant a finding against the respondent in a contested case, the charge or charges must be established by clear and convincing evidence, and at least two of the members of the Trial Panel must concur in the findings."

*State ex rel. Oklahoma Bar Ass'n v. Farrant*, 867 P.2d 1279, 1281 (Okla.1994); *State ex rel. Oklahoma Bar Ass'n v. Gasaway*, 810 P.2d 826, 830 (Okla.1991); *State ex rel. Oklahoma Bar Ass'n v. Braswell*, 663 P.2d 1228, 1232 (Okla.1983).

2. The conduct complained of is a violation of Rule 8.4(a)(b)(c) and (d) and Rule 1.2(c), Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A. Rule 8.4 provides in pertinent part:

"It is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice ...."

Rule 1.2 provides in pertinent part:

"... (c) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law...."

3. Rule 6.13, Rules of Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A provides in pertinent part:

"Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings

## FACTS

In 1988, DeVore, a 2nd Class Petty Officer in the United States Navy stationed in Washington, divorced Tamra Senecal (Senecal/ex-wife). He was awarded custody of two children—a son (K.F.D.) from the marriage and Senecal's son (C.L.K.) from a prior marriage. During the summer of 1992, both children were allowed to come to Oklahoma for visitation with Senecal. It was agreed that Senecal would retain physical custody of C.L.K., her child from the prior marriage. However, K.F.D. was to return to Washington with his father. When DeVore arrived in Oklahoma on August 19th to pick up his son, he was served with a petition for custody covering both children and an *ex parte* emergency order giving temporary custody of the children to Senecal.[4] The order set a hearing for September 2nd. Realizing that he need-

ed legal representation, DeVore called a legal hot line; and he was given Holden's number. He met with Holden the same day.

Because he was scheduled to return to his ship no later than August 29th, DeVore explained to Holden that it was imperative to resolve the custody issue as soon as possible. Holden drafted and filed a writ of *habeas corpus* in an attempt to resolve the custody issue in a timely manner. However, both DeVore and his wife testified that during their first meeting that Holden advised them that their best course of action would be to take K.F.D. and return to Washington.[5]

The show cause hearing on the *ex parte* order and the writ of *habeas corpus* held on August 28, 1992, concluded about noon. The trial judge left temporary custody with Senecal. After the hearing, at his client's re-

---

of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered there-at...."

Rule 6.16, Rules of Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A provides:

"The costs of investigation, the record, and disciplinary proceedings shall be advanced by the Oklahoma Bar Association (or the Professional Responsibility Commission, if provision therefor has been made in its budget). Where discipline results, the cost of the investigation, the record, and disciplinary proceedings shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court for good cause shown. Failure of the disciplined lawyer to pay such costs within ninety (90) days after the Supreme Court's order becomes effective shall result in automatic suspension from the practice of law until further order of the Court."

4. The temporary custody order was issued based on Senecal's allegations that Devore had sexually molested C.S. No allegations of abuse were made concerning K.F.D. The charges of sexual abuse were eventually found to be unsubstantiated.

5. The transcript of proceedings, May 11, 1994, p. 31 provides in pertinent part:

"... Q. And what was the—what was your agreement that he would do for you?
A. At first, he said he would look into whether child protective services or DHS, I believe it

is here in the state of Oklahoma, would—had had any filed charges against—against me or had any investigation ongoing into whatever was supposed to be going on. He looked up some stuff in a little green book and he showed me certain things in that book. I believe it was—I can't say it was for sure, but I believe that was UCCJA.
And also we had discussed the portion—if I could just take him and head back to Washington.
Q. Who brought that idea up?
A. Mr. Holden did.
Q. What did he say about it?
A. He said according to this little green book, that Oklahoma State had no jurisdiction in Washington, and there was legally nothing preventing me at that point—Let me rephrase that.
He said there was no reason that I couldn't just—if I could get close to him, just pick him up and take him back to Washington State...."

Telephone deposition of Lisa DeVore, May 19 & 20, 1994, pp. 18–19 provide in pertinent part:
"... Q. What pieces and parts did you hear?
A. Well, I heard that the best thing for us to do would be to be able to obtain [K.F.D.], to snatch him away from his mother, if we could get our hands on him, and take him back to Washington, since we had custody—the custody was done in Washington.
Q. Okay.
And are the words he used—are those your words or Mr. Holden's words?
A. That was Mr. Holden's words.
Q. Okay.
Do you recall, was there any discussion about the consequences of your doing that?
A. He said that there's—they couldn't do anything to us, as along as we wasn't in the state, and that it should be dropped after that...."

quest, Holden obtained permission for him to have lunch with his son, K.F.D.. C.L.K. was included in the luncheon only after the child asked if he could go. Although Holden maintains that he said nothing to the DeVore's which they could have interpreted as advice to leave the state with K.F.D., the couple testified that Holden advised them to use the lunch hour to go to the airport, and to put K.F.D. on a plane for Washington.[6]

Immediately after the hearing, Devore took his family to the airport and obtained tickets for everyone except himself and C.L.K. to fly to Dallas. After he put his family, including K.F.D., on the plane, Devore took C.L.K. home. He then drove to Dallas to meet his wife and children. They traveled back to Washington.

6. Transcript of proceedings, May 11, 1994, p. 40 provides in pertinent part:
   "... Q. What time of day was this then at the time that Mr. Holden came out of the judge's chambers and spoke with you?
   A. I believe the time was some time around noon of that day.
   Q. Did the parties go back into the courtroom, or what occurred next?
   A. No, sir. Nobody went back into the courtroom. Mr. Holden advised me that he had got me an hour for lunch, that I should take that hour for lunch and go to the airport and fly my child back to the state of Washington.
   Q. You say 'my child'. There were two children involved; correct?
   A. Yes, sir.
   Q. And he suggested you take one, or both?
   A. He suggested that I fly my maternal son, [K.], back to the state of Washington, and at the airport place my stepson, [C.K.], on a cab and send him home to his mother's house...."
   Telephone deposition of Lisa Devore, May 19 & 20, 1994, pp. 151–53 provides in pertinent part:
   "... Q. He [Holden] said, 'Ms. DeVore, are you wondering what's going to happen during the lunch hour?' Is that what he asked?
   A. It was something—I don't know if that's exactly what it was, but he told me what was going to happen....
   Q. Okay. So then, after you say yes, then what does Mr. Holden say?
   A. He said that he told Stephen to go have lunch at the airport, and that we should try to get a plane ticket, for [K.], back to Washington...."

7. Cox's telephone notes taken on September 8, 1992, while talking to Holden were admitted as complainant's exhibit 6. The notes provide in pertinent part:
   "... Atty suggested to Devore:
   ... Atty said use lunch hour to take child to Washington...."

When DeVore reached his duty station, he contacted the Naval Judge Advocate who advised him to seek independent counsel. Learning that he had been cited for contempt for violating the Oklahoma court order and that criminal charges had been filed for child stealing, DeVore contacted Jeffrey Cox (Cox). Cox is an attorney practicing in Port Orchard, Washington. DeVore told Cox that he had removed his son from Oklahoma on the advice of his attorney. On September 8, 1992, Cox contacted Holden to determine the status of the domestic relations action and to confirm whether Holden had advised DeVore to remove the child from Oklahoma. During the telephone conversation, Holden admitted to Cox that he advised DeVore to fly K.F.D. back to Washington.[7]

Cox's affidavit provides in pertinent part:
"... 7. On September 8, 1992, in order to determine the status of the Oklahoma City domestic relations action and to determine whether, in fact, Mr. DeVORE's attorney had advised him to remove his son from the State of Oklahoma and return with him to the State of Washington, I contacted DUKE HOLDEN by telephone ...
8. Mr. HOLDEN recounted the course of the hearing up to the recess. Mr. HOLDEN said he advised STEPHEN D. DeVORE to use the recess to take his son to the airport and try to obtain a flight to take the child to Washington State.... Mr. HOLDEN confirmed to me that he recommended to Mr. DeVORE that he use the hearing recess to obtain an airplane flight to the State of Washington with his son, [K.F.D.], after arranging for his stepson, [C.L.K.], to be returned to the natural mother...."
Cox's testimony concerning Holden's advice to his client is found at pp. 197–98 of the transcript. It provides in pertinent part:
"... Q. And can you tell us generally the conversation in its initial stages, what conversation you had with Mr. Holden?
A. Yes.... He recounted the events of the hearing ... He indicated that during the hearing, the judge interviewed the two sons in chambers, took evidence from them in chambers.
I asked him what happened then. He said that he got in a one-hour recess or—excuse me—that he'd gotten a one-hour lunchtime visit for the children with Mr. and Mrs. DeVore. Said he told Mr. DeVore that he was going to get shafted by this judge. He said that he told Mr. DeVORE to use the lunch hour, arrange for the return of the stepson to the natural mother's household, and to take the son to the airport and get a flight to the state of Washington. He talked about the fact that the Oklahoma court lacked jurisdiction; that there was no

Cox obtained counsel in Oklahoma to represent Devore on the child custody matter and on the felony count of child stealing. Carolyn Thompson (Thompson) was retained to handle the custody matter, and Doug Parr (Parr) was hired to handle the criminal charges. The contempt action was dismissed. DeVore was given a two-year probationary period on the felony charges arising from the removal of his son to Washington. Additionally, K.F.D. was removed from the DeVore's home by Washington authorities for three months while the sexual abuse charges were being investigated in Oklahoma.

On October 1, 1992, Thompson filed a complaint with the Bar Association on behalf of DeVore. The trial panel heard evidence on May 11, 1994, and on June 1, 1994. It issued its order with recommended findings of fact, conclusions of law and proposed discipline on July 6, 1994. It found that although the evidence was controverted, clear and convincing evidence existed to support a finding that Holden advised, or at least led DeVore to believe, that violating the Oklahoma custody order would be without serious consequences if the child were removed from Oklahoma. The trial panel recommended an eighteen month suspension and the imposition of costs.

**THE FINDING THAT THE ATTORNEY ADVISED HIS CLIENT TO REMOVE A CHILD FROM OKLAHOMA IN VIOLATION OF A COURT ORDER IS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE. THE CONDUCT WARRANTS A ONE YEAR SUSPENSION AND THE IMPOSITION OF COSTS.**

■ Holden denies saying anything to DeVore which could have been interpreted as

advice to leave Oklahoma with his son in violation of the district court's order. He insists that the trial panel's findings are not supported by clear and convincing evidence. Holden contends that if the Court should find the charges to be substantiated that a lesser discipline should be imposed. However, he does not state what an appropriate discipline would be. The Bar Association supports the recommended discipline—an eighteen month suspension and the imposition of costs.

■ Before this Court may impose discipline upon an attorney, the charges must be established by clear and convincing evidence.[8] In disciplinary matters, this tribunal exercises exclusive original jurisdiction.[9] Our review is *de novo* in considering the record presented as well as recommendations for discipline.[10] The ultimate decision rests with this Court. Neither the findings of fact of the trial panel nor its view of the weight of the evidence or credibility of the witnesses bind us.[11]

This is not a situation in which the sole testimony against the attorney is presented by a dissatisfied client. Instead, the condemning evidence was presented through an out-of-state attorney who confirmed that Holden admitted to telling DeVore to leave the jurisdiction of the Oklahoma court with his son. Cox, through his testimony before the trial panel, in his affidavit submitted with the complaint, and by the presentation of his notes during the hearing, established the facts of his conversation with Holden.[12] The evidence is clear and convincing that Holden advised DeVore to leave Oklahoma and to return to Washington with his son. The

emergency here in the state of Washington; and that if worse come to worse, when he got to Washington, the child custody issues can be litigated in the state of Washington...."

8. Rule 6.12, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v. Farrant*, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v. Gasaway*, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v. Braswell*, see note 1, supra.

9. *State ex rel. Oklahoma Bar Ass'n v. Farrant*, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v.*

*Gasaway*, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v. McMillian*, 770 P.2d 892, 894 (Okla.1989).

10. *State ex rel. Oklahoma Bar Ass'n v. Farrant*, see note 1 at 1284, supra; *State ex rel. Oklahoma Bar Ass'n v. Gasaway*, see note 1 at 830–31, supra; *State ex rel. Oklahoma Bar Ass'n v. Stubblefield*, 766 P.2d 979, 982 (Okla.1988).

11. *State ex rel. Oklahoma Bar Ass'n v. Farrant*, see note 1 at 1284, supra.

12. See note 7, supra.

conduct complained of is a violation of Rule 8.4(a)(b)(c) and (d) and Rule 1.2(c), Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A.[13]

■■■ Our responsibility in a disciplinary proceeding is not to punish but to inquire into and to gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts and of the legal profession.[14] Discipline is imposed to maintain these goals rather than as punishment for the lawyer's misconduct.[15] When determining discipline for attorney misconduct, the Court compares circumstances with those of previous disciplinary proceedings, examines the attorney's previous record of professional behavior and determines how best to serve the welfare of the public and the integrity of the bar.[16]

The attorney in *State ex rel. Oklahoma Bar Ass'n v. Caldwell*, 880 P.2d 349, 354 (Okla.1994) was charged with two counts of misconduct. The first count involved a garnishment proceeding based upon an order entered in violation of an agreement with the opposing party and his attorney. The attorney also misrepresented the facts surrounding this issue to the Bar Association. The second count is similar to the one presented here.

In *Caldwell*, the attorney was representing clients in an attempted adoption. Mrs. R. originally agreed to voluntarily place her children for adoption with the Department of Human Services (Human Services). She recanted upon the agreement, but eventually appeared before the district court and executed a written consent for adoption. The clients took custody of the children and traveled with them to Mississippi. They removed the children on the advice of Chambers that: 1) it was legally permissible to do

so; 2) the natural father had no legal rights in the matter; and 3) the father was not entitled to notice of the adoption. The attorney did not advise the clients that it was necessary to file a petition for adoption in the county of their residence. The attorney eventually filed adoption proceedings in Tulsa County which were dismissed. During the course of the proceedings, Caldwell originally failed to give notice to the father and misrepresented to the district court that the signatures on the petition for adoption were genuine. When the adoption proceedings were dismissed, Caldwell refused to advise his clients that the children must be returned to Oklahoma. This Court suspended Caldwell from the practice of law for a period of two years and one day and costs were imposed.

We recognize that only a single count of misconduct is levied against Holden. We also acknowledge that Holden is not charged with the misrepresentations to the tribunal and to the clients which were involved in *Caldwell*. A number of witnesses appeared on Holden's behalf to attest to his good character and to his ethical practice of the law. However, Holden did advise the DeVores to remove a child from Oklahoma in violation of a court order. Lawyer misconduct falls within two basic categories—serious and minor.[17] Although Holden's actions may not have resulted in grave economic harm to his client, DeVore has been required to expend considerable sums in the defense of the custody issue and of the criminal charges. DeVore's decision to leave the Navy was due in part to the charges having been filed in Oklahoma, and his son was removed from his custody for a period of three months by Washington officials.

13. Rule 8.4(a)(b)(c) and (d) and Rule 1.2(c), Rules of Professional Conduct, 5 O.S.1991, Ch. 1, App. 3–A, see note 2, supra.

14. *State ex rel. Oklahoma Bar Ass'n v. Donnelly*, 848 P.2d 543, 545 (Okla.1992); *State ex rel. Oklahoma Bar Ass'n v. Colston*, 777 P.2d 920, 925 (Okla.1989); *State ex rel. Oklahoma Bar Ass'n v. Moss*, 682 P.2d 205, 207 (Okla.1983).

15. *State ex rel. Oklahoma Bar Ass'n v. Farrant*, see note 1 at 1286, supra; *State ex rel. Oklahoma*

*Bar Ass'n v. Johnston*, 863 P.2d 1136, 1144–45 (Okla.1993); *State ex rel. Oklahoma Bar Ass'n v. Raskin*, 642 P.2d 262, 267 (Okla.1982).

16. *State ex rel. Oklahoma Bar Ass'n v. Farrant*, see note 1, supra; *State ex rel. Oklahoma Bar Ass'n v. Downing*, 804 P.2d 1120, 1123 (Okla. 1990).

17. *State ex rel. Oklahoma Bar Ass'n v. Donnelly*, 848 P.2d 543, 548 (Okla.1992).

Attorney misconduct related to the parent-child relationship is a serious matter.[18] The trial panel has suggested an eighteen-month suspension. However, respected members of the judiciary and of the Bar testified that they would consider Holden's giving the alleged advice to his client an aberration. All these witnesses were unanimous in their belief in Holden's honesty and good character. This testimony is considered in mitigation of the recommended discipline.[19] On *de novo* review,[20] considering the character evidence offered in Holden's behalf, and the discipline imposed in *Caldwell*—two years and one day on a similar charge but with additional violations of professional conduct, we find that a one year suspension is warranted here.

The Bar Association submitted an application to assess costs of $5,333.39 on September 20, 1994. The costs are itemized and copies of the bills associated with the proceeding are attached to the Bar Association's application. Holden has not filed any pleading in response to the application. Holden is responsible for the costs of the disciplinary proceeding.[21]

## CONCLUSION

The nondelegable, constitutional responsibility to regulate both the practice and the ethics, licensure, and discipline of the practitioners of the law is solely vested in this Court.[22] Upon a *de novo* review of the record, we find that the Bar Association established by clear and convincing evidence that Holden advised his client to remove a child from Oklahoma in violation of a court order. The conduct warrants a one year suspension and the payment of costs in the amount of $5,333.39. Payment of the costs is to be accomplished within thirty days of the date of this opinion. Prompt payment is a precondition to reinstatement.

## RESPONDENT SUSPENDED; COSTS IMPOSED.

KAUGER, V.C.J., and LAVENDER, OPALA, SUMMERS and WATT, JJ. concur.

SIMMS, Justice, dissenting:

I would accept the recommendation of the Professional Responsibility Tribunal and suspend respondent for 18 months.

HARGRAVE, Justice, with whom ALMA WILSON, C.J. and HODGES, J. join, dissenting:

I do not find the evidence to be clear and convincing in this matter, and would not impose discipline.

18. *State ex rel. Oklahoma Bar Ass'n v. Stubblefield,* see note 10 at 983–84, supra.

19. *State ex rel. Oklahoma Bar Ass'n v. Stubblefield,* see note 10 at 984, supra; *State ex rel. Oklahoma Bar Ass'n v. Steger,* 433 P.2d 225 (Okla.1966). See also, *State ex rel. Oklahoma Bar Ass'n v. English,* 853 P.2d 173, 176 (Okla. 1993).

20. This Court's review is *de novo* in considering the record presented as well as recommendations for discipline. *State ex rel. Oklahoma Bar Ass'n v. Farrant,* see note 1 at 1284, supra; *State ex rel. Oklahoma Bar Ass'n v. Gasaway,* see note 1 at 830–32, supra; *State ex rel. Oklahoma Bar Ass'n v. Stubblefield,* see note 10, supra.

21. Rule 6.16, Rules of Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A, see note 3, supra.

22. *State ex rel. Oklahoma Bar Ass'n v. Farrant,* see note 1 at 1287, supra; *Tweedy v. Oklahoma Bar Ass'n,* 624 P.2d 1049, 1052 (Okla.1981).