OSCN Found Document:STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MESSERLI

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MESSERLI
2024 OK 56
Case Number: SCBD-7529
Decided: 06/25/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 56, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

STATE OF OKLAHOMA ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,
v.
ROBERT MURL MESSERLI, Respondent.
ORIGINAL PROCEEDING FOR ATTORNEY DISCIPLINE
¶0 The Oklahoma Bar Association instituted this disciplinary proceeding pursuant to Rule 6 of the Rules Governing Disciplinary Proceedings, 5 O.S.2021, ch. 1, app. 1--A. Respondent agreed to certain facts, and a hearing was held before a trial panel of the Professional Responsibility Tribunal. We find that Respondent violated Rules 1.1, 1.3, 1.4, 3.2, 8.1(b), and 8.4(d) of the Oklahoma Rules of Professional Conduct, and Rules 1.3 and 5.2 of the Rules Governing Disciplinary Proceedings. We conclude that Respondent should be suspended for a period of two years and a day to commence on the date of this opinion and ordered to pay costs as provided herein.
RESPONDENT SUSPENDED FROM THE PRACTICE OF LAW FOR 
TWO YEARS AND ONE DAY; RESPONDENT ORDERED TO PAY 
COSTS OF THE PROCEEDING
Tracy Pierce Nester, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, Oklahoma for Complainant
Robert M. Messerli, pro se, Tulsa, Oklahoma.
GURICH, J.
I. FACTS AND PROCEDURAL HISTORY
¶1 Respondent Robert Murl Messerli was a full-time volunteer with Catholic Charities from August 2008 through December 2008 while he studied for the Bar exam. On June 8, 2009, he was licensed to practice law in Oklahoma. In July 2009, Respondent was formally hired by Catholic Charities as an Immigration Case Manager. Over the years, he was promoted, becoming Supervising Attorney where he was responsible for supervising and mentoring young attorneys.
¶2 Attorney Catie Coulter was hired by Catholic Charities as an office manager in December 2018. Between October 2020 and early 2021, Coulter discovered problems with the work of employee Michael Abdoveis, a junior attorney at Catholic Charities.
[1] At the time, the junior attorneys, including Abdoveis, reported to Respondent. After the issues with Abdoveis became apparent, Coulter took over the supervision of all attorneys and legal representatives. Catholic Charities did an internal audit of Abdoveis's work and, in July 2021, determined that "it was time for him to leave" Catholic Charities. In summer 2021, Catholic Charities contracted with attorney Elizabeth Edwards to help handle some of Abdoveis's cases. While working in that capacity, Edwards was asked to assist with Respondent's cases and began noticing problems with Respondent's work. Edwards reported her concerns to Coulter in December 2021. Edwards was asked to switch from managing cases to conducting an independent audit of Respondent.
¶3 Edwards began an audit of Respondent's files in January 2022. The audit covered hundreds of files, and it revealed that Respondent had neglected multiple cases; misrepresented or lied to clients about the status of multiple cases; and failed to timely submit required filings in multiple cases. The audit also found that Respondent failed to keep adequate notes in its case management system in disregard of Catholic Charities' policy. In some cases, Respondent failed to keep physical files for the client. Based on the findings of the audit, Respondent was asked to resign from his employment with Catholic Charities on May 11, 2022. The same day, due to Respondent's misconduct while employed by Catholic Charities, Edwards filed a grievance with the Oklahoma Bar Association (OBA).
¶4 The OBA opened a formal investigation into the allegations of misconduct on August 12, 2022. A copy of the Edwards grievance was mailed to Respondent at his official roster address, which was still listed as the P.O. Box for Catholic Charities. Respondent was asked to give a response in writing within twenty days. This letter was returned to the OBA with a message that the Respondent was no longer at that address.
¶5 A second grievance was filed by former client Eleticia Hernandez de Martinez on August 19, 2022. On August 31, 2022, the OBA mailed a letter to Respondent at his roster address advising him that a formal grievance had been opened. The OBA gave Respondent twenty days to respond, but he failed to do so.
¶6 On August 26, 2022, the OBA received a supplement to the Edwards grievance from Catie Coulter on behalf of Catholic Charities. The OBA mailed a copy of the Coulter supplement to Respondent at his official roster address on September 1, 2022. Respondent was given twenty days to respond in writing but failed to do so. Coulter sent a copy of her supplement to Respondent at his home address on September 6, 2022.
¶7 On September 9, 2022, the OBA received a copy of Coulter's September 6, 2022, letter to Respondent which listed Respondent's home address. On October 14, 2022, the OBA mailed a certified letter to Respondent's home address advising him to contact the OBA's Office of the General Counsel within five days or an Application for a Subpoena Duces Tecum would be made regarding the Edwards grievance and Coulter supplement. It was returned unclaimed.
¶8 On September 23, 2022, the OBA mailed a certified letter to Respondent's home address advising him to contact the OBA's Office of the General Counsel within five days or an Application for a Subpoena Duces Tecum would be made regarding the Martinez grievance. It was returned undeliverable.
¶9 On January 11, 2023, the OBA filed an address information request form with the United States Postal Service, asking it to confirm Respondent was receiving mail at his home address. The Postal Service confirmed Respondent did receive mail at that address.
¶10 On January 13, 2023, the OBA resent the August 12, 2022, and October 14, 2022, letters regarding the Edward grievance and Coulter supplement by regular and certified mail to Respondent's home address. The certified mail was delivered on January 17, 2023. Respondent was again asked to respond and failed to do so.
¶11 The OBA mailed the Martinez grievance to Respondent at his home address on February 10, 2023, via regular and certified mail. The certified mail was delivered on February 13, 2023. Respondent was asked to respond in writing within twenty days but failed to do so.
¶12 In addition to the written correspondence, the OBA attempted to reach Respondent via telephone. Those attempts were futile. Due to Respondent's failure to respond to the grievances or phone calls, the OBA made the decision to take Respondent's deposition. The OBA obtained personal service on Respondent requiring him to attend a deposition, which he did, on February 28, 2023. At the deposition, Respondent stated that he was in receipt of the grievances and requested more time to respond. Although the OBA allowed him thirty days to respond to the grievances, he did not respond.
¶13 On July 27, 2023, the OBA filed a complaint in this Court alleging two counts. Count I alleged misconduct related to Respondent's employment with Catholic Charities and listed seven cases as a representative sample. The OBA alleged that, as to Count I, Respondent violated Oklahoma Rules of Professional Conduct (ORPC) 1.3 (diligence),
[2] 1.4 (communication),[3] 8.1(b) (failure to respond to a lawful demand for information from a disciplinary authority),[4] 8.4(a) (violation of the ORPC),[5] and 8.4(d) (conduct prejudicial to justice),[6] and the Rules Governing Disciplinary Proceedings (RGDP) 1.3 (acts contract to prescribed standards)[7] and 5.2 (investigations).[8] For Count II, the OBA asserted one instance of misconduct that violated ORPC 1.3, 1.4, 8.1(b), 8.4(a), and 8.4(d), and RGDP 1.3 and 5.2.
¶14 For the first time since the investigation in this case was initiated, Respondent filed a written response to the Complaint on August 17, 2023.
¶15 A hearing was held before a trial panel of the Professional Responsibility Tribunal (PRT) on October 10, 2023. The OBA presented 40 exhibits and called six witnesses in support of its case: Catie Coulter; Elizabeth Edwards; Eliticia Hernandez de Martinez; Gerson Eduardo Martinez Hernandez, Martinez's son; Elissa Stiles, the new attorney for the Martinez-Hernandez family; and Krystal Willis, the OBA investigator assigned to Respondent's case. Respondent submitted no exhibits and called no witnesses, but he testified on his own behalf. On November 13, 2023, the PRT filed its report with this Court. The PRT found that though Respondent "does have a heart for the clientele for whom he worked," he violated Rules 1.1 (competence),
[9] 1.3 (diligence), 1.4 (communication), and 8.4(d) (misconduct)[10] of the ORPC. The PRT recommended a suspension of one year, as well as imposing a requirement that upon reinstatement, Respondent be required to report to a supervising attorney knowledgeable in immigration law for one year. The PRT also recommended that Respondent be ordered to pay the costs of the proceedings.
¶16 Although the OBA initially recommended a one-year suspension, it asserted in its brief in chief that a suspension of up to two years and one day may be warranted based on the clear and convincing evidence of affirmative acts of misconduct in this case. The OBA has also made an application for an order assessing the costs of these proceedings against Respondent in the amount of $3,158.25.
II. STANDARD OF REVIEW
¶17 This Court has exclusive original jurisdiction in Bar disciplinary proceedings. State ex rel. Okla Bar Ass'n v. Holden, 1995 OK 25, ¶ 10, 895 P.2d 707, 711. We review the evidence de novo to determine whether the OBA proved the allegations of misconduct by clear and convincing evidence. State ex rel. Okla. Bar Ass'n v. Bolusky, 2001 OK 26, ¶ 7, 23 P.3d 268, 272. The goal in disciplinary proceedings is not to punish the offending lawyer, but rather to protect the interests of the public and to preserve the integrity of the courts and legal profession. State ex rel. Okla. Bar Ass'n v. Kinsey, 2009 OK 31, ¶ 15, 212 P.3d 1186, 1192. The decision to impose disciplines rests solely with this Court and the recommendations of the PRT are neither binding nor persuasive. State ex rel. Okla. Bar Ass'n v. Eakin, 1995 OK 106, ¶ 8, 914 P.3d 644, 648.
III. VIOLATIONS
A. I. Count I: Grievance by Catholic Charities of Eastern Oklahoma
¶18 Edwards filed a grievance against Respondent on May 11, 2022, the same day Respondent resigned from Catholic Charities. Coulter submitted a supplement to Edwards' Grievance on August 26, 2022. This supplement gave a case-by-case synopsis of twenty cases in which Respondent displayed incompetence, ranging from 2014 to 2022. Respondent was aware of and was asked to respond to both the Edwards grievance and the Coulter supplement in writing prior to the OBA filing a Complaint with this Court, but he never did.
¶19 In her supplement, Coulter alleged that this was a representative sample because the clients that had been potentially harmed by Respondent's actions were too numerous to list. The cases she identified are as follows:
a. J.I.A.Z. was in removal proceedings when he went to Catholic Charities. Respondent identified that he was eligible for Special Immigrant Juvenile Status (SIJS).
[11] Though Respondent filed the paternity petition, which allowed for the administrative closure of the removal proceedings,[12] Respondent did not follow through with the paternity case and obtain a final order. As J.I.A.Z. aged out prior to obtaining the predicate order, he is no longer eligible for SIJS. The client is not eligible for any other immigration benefit. 
b. W.A.G.A. came to Catholic Charities as he was in removal proceedings. Respondent identified that he was eligible for SIJS. Respondent filed a paternity action in 2020, however, that action was closed by the court in 2021 due to inactivity. Because client's mother was frustrated by the inability to communicate with Respondent, and to try to obtain some relief for her child, client's mother obtained a divorce in her home country in 2022. The status of this case is uncertain, but the client was in removal proceedings at the time of the Complaint.
c. E.V.A.L. became a client of Catholic Charities when he was subject to removal proceedings and was determined to be eligible for SIJS. Respondent filed a paternity action and obtained administrative closure of the removal proceedings but did not obtain a final order. As E.V.A.L. has now aged out, he cannot obtain SIJS. E.V.A.L.'s mother included client in her U visa application, but the damage is still significant.
[13]
d. D.O.O.B. came to Catholic Charities when she was in removal proceedings. Respondent identified the client as eligible for SIJS. Respondent filed a paternity petition and obtained administrative closure of the removal proceedings, but he never obtained a final order as required for SIJS. D.O.O.B. has now aged out, is no longer eligible for SIJS, and is not eligible for any other immigration benefit.
e. M.J.F.E. was subject to removal proceedings when she came to Catholic Charities and was determined to be eligible for SIJS. Respondent filed a paternity petition and obtained administrative closure of the removal proceedings but did not complete the final order. As M.J.F.E. has now aged out, she cannot obtain SIJS. M.J.F.E. was pursuing an asylum application
[14] as well as being included as a derivative on her mother's U visa application.
f. I.G.R.A. came to Catholic Charities seeking assistance in removal proceedings. Instead of filing for SIJS--which I.G.R.A. qualified for--Respondent did not identify or inform the client that he was eligible for such relief and only included him as a derivative on his mother's asylum application. The client is no longer eligible for SIJS.
g. K.F.M. was in removal proceedings when she came to Catholic Charities. Instead of filing for SIJS--which K.F.M. qualified for--Respondent did not identify or inform the client that she was eligible for such relief and only included her as a derivative on their mother's asylum application. Client is no longer eligible for SIJS.
h. J.G.G.'s mother initially came to Catholic Charities for a consult for her and her two children as they were in removal proceedings. Instead of filing for SIJS--which J.G.G. qualified for--Respondent did not identify or inform the client that he was eligible for such relief and only included him as a derivative on their mother's asylum application. J.G.G. is no longer eligible for SIJS.
i. S.V.R. came to Catholic Charities with his mother and was in removal proceedings. Instead of filing for SIJS--which S.V.R. qualified for--Respondent did not inform the client that he was eligible for such relief and only included him as a derivative on his mother's asylum application. He is no longer eligible for SIJS.
j. Siblings L.A.F.O. and M.G.F.O. came to Catholic Charities when they were in removal proceedings. Respondent identified both as being eligible for SIJS. Respondent filed paternity petitions on behalf of each sibling, but he never obtained a final order as required for SIJS. The clients are no longer eligible for SIJS or any other immigration benefit. 
k. A.A.V.P. was in removal proceedings when she sought advice from Catholic Charities. Respondent was successful in obtaining SIJS for the client. Five months later, after the SIJS application was granted, the client married. Respondent failed to advise the client that she was eligible to adjust to Lawful Permanent Residence status and that marriage would render her ineligible for SIJS. The client is not eligible for any further relief.
l. I.R.M.B. became a client of Catholic Charities when he was over the age of eighteen. Due to his partial incapacity, Respondent believed that I.R.M.B. might be eligible for SIJS via a limited adult guardianship. Though Respondent obtained an Emergency Order Appointing Limited Guardian, he failed to appear at two hearings and never obtained a final order in the case. Respondent did file a SIJS petition, however it was denied due to his failure to respond to a Notice of Intent to Deny. I.R.M.B. was ordered removed in 2019. Though Respondent filed a Notice of Appeal, the client retained other counsel for the remainder of his case and the status is unknown. 
m. N.Y.V.A. was in removal proceedings when she came to Catholic Charities. Respondent identified that she was eligible for SIJS. N.Y.V.A. was ordered removed two years later due to Respondent's failure to petition for SIJS. After removal was ordered, Respondent filed an adult guardianship and obtained an Emergency Order Appointing Limited Guardian. Only then did Respondent file the SIJS petition. It was denied for Respondent's failure to respond to a Notice of Intent to Deny which stated that, since N.Y.V.A. was over the age of eighteen when the guardianship was granted, it did not meet the burden of proof that the court had jurisdiction over the client as a juvenile. Further, Respondent sought relief primarily to obtain an immigration benefit (which is not the purpose of SIJS and is unallowable). N.Y.V.A. was ordered removed due to Respondent's failure to timely file the SIJS petition.
n. L.F.G.G. came to Catholic Charities when he was over eighteen and in removal proceedings. Due to his partial incapacity, Respondent believed that he may be eligible for SIJS via a limited adult guardianship. In this case, Respondent was unable to obtain the predicate order before the client turned twenty-one. The status of this case is unknown. 
o. P.C.F.N. entered the U.S. in 2017 and became a client of Catholic Charities shortly after. Respondent identified the client as being eligible for asylum. Asylum applications are due one year from the date the client entered the country. Respondent filed the application one day late. Client obtained private counsel and the status is unknown. 
p. M.M. entered the U.S. in June 2016 and consulted with Respondent in January 2017. Respondent identified that the client was eligible for asylum and the application was due in June 2017. Respondent did not submit the application until March 2018. Respondent informed M.M. of his late filing and that he could submit a bar complaint in order to file a Lozada claim,
[15] but M.M. chose not to do so. The status of this case is unknown.
q. R.C.Q. came to Catholic Charities to obtain a provisional waiver which would lead to her obtaining Lawful Permanent Residence. The client provided the required information, evidence, and filing fees to Respondent who was to submit the application in March 2020. Respondent informed the client that he had submitted the waiver application, and the money order the client had given Respondent for the filing fee was cashed. There is evidence that Respondent tried to pay the filing fee in January 2022.
[16] Despite this, Respondent's notes, and lack of a receipt notice from USCIS, reflect that no application has been filed in this case. 
r. C.Y.M. was eligible for a provisional waiver in 2016. In 2017, Client provided evidence to Respondent to support a provisional waiver and provided money orders for the filing fee. The application was signed and dated in 2019. Respondent represented to the client that the application had been submitted and she would have to wait for a response. Respondent did not file the provisional waiver application until June 2021, at which time the evidence associated with the application was outdated. The application remains pending, but the status is unknown.
s. J.C. retained Respondent to file a motion to reopen and reconsider the USCIS decision revoking J.C.'s civil surgeon designation. Respondent filed the motion late and it was dismissed.
¶20 In its Complaint filed with this Court, the OBA only specifically listed seven counts from the Coulter supplement, stating that because the harmed clients were too numerous to identify or are impractical to utilize as witnesses, it was setting forth a representative sample of the cases in which Respondent committed misconduct while employed with Catholic Charities. The Complaint specifically listed: J.I.A.Z., W.A.G.A., E.V.A.L., D.O.O.B., M.J.F.E., L.A.F.O., and M.G.F.O.
¶21 In response to the OBA's Complaint, Respondent submitted his first, and only, written response in this case on August 17, 2023. In it, Respondent wholly admits misconduct as to J.I.A.Z. and M.J.F.E. Respondent admits in part and denies in part his conduct associated with siblings L.A.F.O. and M.G.F.O.
[17] Respondent asserts that he filed a paternity action on behalf of L.A.F.O. and M.G.F.O., but during the pendency of the action, the children's father passed away. Respondent admits he might have been able to complete the paternity action sooner but failed to do so.
¶22 Respondent denies the allegations as they pertain to W.A.G.A., E.V.A.L., and D.O.O.B. Respondent asserts that he filed a paternity action on behalf of W.A.G.A., however, Respondent determined that he could not proceed because W.A.G.A.'s mother was still married in another country. Respondent advised W.A.G.A.'s mother that she would have to obtain a special order via a divorce decree and Catholic Charities did not handle such proceedings. As to E.V.A.L., Respondent stated that though he did file a paternity action, service could not be completed due to service issues with the biological father. Respondent determined that E.V.A.L. was eligible for other relief and it provided a better chance of success, so he did not move forward with SIJS in E.V.A.L.'s case. As to D.O.O.B., Respondent asserts that he filed a paternity action
[18] on behalf of D.O.O.B. but did not have time to complete it because she turned eighteen four months after her initial consultation. Respondent thought the paternity action might still be possible and understood that she was going to seek other counsel.
¶ 23 Although the OBA Complaint only included seven specific instances of misconduct, Coulter's supplement was admitted as an exhibit before the PRT and attached as an exhibit to the final report of the PRT.
¶24 The OBA called Catie Coulter and Elizabeth Edwards to testify regarding the allegations in the grievance and supplement. Coulter, the Senior Director of Catholic Charities, testified that Respondent was disorganized, failed to keep notes in Catholic Charities' case management system, and failed to maintain a physical file for each client. Coulter also testified that Respondent had made misrepresentations to C.Y.M., telling her that Respondent had filed an application when he had not. She further testified Respondent also continued to pursue a legal theory--guardianship after the age of eighteen--despite previous denials based on the theory. Coulter testified to Respondent's failures, including: failing to follow through with cases and obtain predicate orders; failing to include all eligible family members on applications; failing to keep in contact with clients; failing to withdraw from a case and report himself to the Bar to allow for a Lozada claim; and failing to timely file required forms or pleadings. Coulter testified that it was not necessarily the mistakes themselves that led to the request for Respondent's resignation, but rather the sheer number of mistakes Respondent had made.
¶25 Elizabeth Edwards also testified as to Respondent's disorganization and failure to keep adequate records. She testified that Respondent failed to obtain emergency orders when appropriate and did not adhere to best practices by obtaining SIJS when available. Edwards also addressed the specific cases that Respondent refuted in his Response. Edwards asserted that Respondent failed to do a proper intake of W.A.G.A. and failed to properly inform the mother of her options in this case. As to E.V.A.L., Edwards testified that while he may still have a way forward through the U visa application of a parent, applications are limited and can take several years to complete. Edwards testified that SIJS is a much faster, better option. As to D.O.O.B., Edwards testified that she disagreed that the guardianship for D.O.O.B. could not be completed because Respondent could have obtained an emergency order, or he possibly could have even concluded the proceedings before D.O.O.B. aged out.
¶26 The OBA submitted forty exhibits supporting Coulter and Edwards' testimony. The OBA also sponsored testimony from Krystal Willis regarding Respondent's failure to answer the grievances in writing.
¶27 The PRT filed its report on November 13, 2023. The report found that the OBA had proven by clear and convincing evidence that Respondent violated Rules 1.1 (competence), 1.3 (diligence), 1.4 (communication), and 8.4(d) (conduct prejudicial to the administration of justice), ORPC.
¶28 The OBA alleges that, as to Count I, it has established by clear and convincing evidence that: Respondent continuously failed to timely file applications, pleadings, and briefs; Respondent would file an initial suit, obtain administrative closure of the removal case, and simply not follow through to obtain SIJS; misrepresented the status of their case to clients; failed to file a grievance against himself to allow his client a way forward after his failure; and failed to adequately communicate with clients. We hold that the OBA has met its burden to prove by clear and convincing evidence that Respondent's conduct violates Rule 1.1, 1.3, 1.4, 3.2,
[19] 8.1(b), and 8.4(d), ORPC, and Rule 1.3 and 5.2, RGDP.

II. Count II: Grievance by the Martinez-Hernandez Family

¶29 Eliticia Hernandez de Martinez submitted a grievance against Respondent on August 19, 2022, stemming from Respondent's representation of her family. Martinez retained Respondent in 2016 to obtain asylum for herself and her sons. The immigration court set a deadline within which they were to file their asylum applications. Respondent did not timely file the applications. Respondent attempted to correct this by filing a motion requesting the immigration court to accept the filing and that the error was on his part and was not due to the fault of his client. This motion was denied, and the removal proceedings were ordered. Though Respondent timely appealed the ruling to the Board of Immigration Appeals, he failed to notify ICE of the appeal and failed to timely file his appellate brief. Respondent's failure to notify ICE of the pending appeal resulted in Martinez and her children presenting themselves to ICE, where they were all apprehended, and her children were put in chains.
¶30 The OBA included the Martinez grievance as Count II in its Complaint filed with this Court.
¶31 Respondent never responded to the grievance, but in his Response to the OBA's Complaint, he admitted the allegations as to Eliticia Hernandez de Martinez. He stated that he missed the deadline due to a calendaring error, but that he attempted to correct his mistake. Respondent stated that he advised Martinez to submit an appeal of the decision due to ineffective assistance of counsel. He alleges that he advised her how to file a complaint and referred her to other counsel. Respondent did not address the Martinez-Hernandez family's case in his testimony before the PRT.
¶32 Martinez testified as to the issues with her asylum case before the PRT. Though the Martinez grievance and the OBA's Complaint only referenced Respondent's failure as to the asylum claim, Martinez's son, Gerson Eduardo Martinez Hernandez, testified before the PRT that Respondent also failed to obtain a work permit for him. Though Hernandez had completed the requisite form, it was denied because the form was expired when it was submitted. Hernandez testified that he had completed another form; however, he had not heard anything further from Respondent and assumed no work permit was issued.
¶33 Elissa Stiles, an attorney from Rivas & Associates, testified that the Martinez-Hernandez family hired her firm to address Respondent's failures. In her testimony before the PRT, Stiles described Respondent's failures in the asylum case and that there was no evidence that any application for a work permit had been filed on behalf of Hernandez. She also testified as to Respondent's lack of communication when she asked for the family's file.
¶34 In his Response to the OBA Complaint, Respondent admitted his neglect with regard to the asylum case, however, he gave no testimony about this Count at the PRT hearing. The OBA proved by clear and convincing evidence that Respondent violated the ORPC as to Count II. Respondent continuously failed to timely file applications, pleadings, and briefs, as to both the asylum claim and the work permit; Martinez and Hernandez both testified that Respondent failed to communicate with them; Respondent failed to file a grievance against himself to allow the family to pursue a Lozada claim due to his missing deadlines; and Respondent did not respond to the grievances in writing in this case. Therefore, we find that, as to Count II, Respondent violated Rules 1.1, 1.3, 1.4, 3.2, 8.1(b), and 8.4(d), ORPC, Rules 1.3 and 5.2, RGDP.

B. Mitigation

¶35 Mitigating circumstances may be considered when assessing the appropriate quantum of discipline. State ex rel. Okla. Bar Ass'n v. McCoy, 2010 OK 67, ¶ 25, 240 P.3d 675, 684. Respondent testified that he overwhelmed himself in a misguided attempt to serve a deserving clientele. He received negligible training and had very little supervision until February 2022. Though he knew that he was falling behind as early as 2016, he was unaware of the extent of his negligence until the audit by Catholic Charities.
¶36 Though Respondent disagrees with some of the allegations of misconduct, he acknowledges that he was negligent in some of the cases. He testified that he recognized the gravity of his mistakes and the lasting consequences that some of his clients face due to his failures. He also admitted the fact that he was in control of his caseload and failed to recognize his own limits. He now works from his home office in a small solo practice. He limits the scope of his practice and is paid either in a lump sum or by payments after the work is completed.
¶37 Respondent testified that he struggled with anxiety, depression, and attention deficit disorder. He stated that he is receiving treatment.
¶38 Respondent has no record of prior discipline and there was no evidence that Respondent had any financial incentive for accepting the high volume of cases that led to the misconduct.

C. Discipline 

¶39 In its report, the PRT stated that since Respondent did not dispute violating the cited rules, the question is not whether he committed the infractions but rather what is the appropriate punishment. The goal of this Court is not to punish, but rather to gauge an attorney's fitness to continue to practice law in order to safeguard the interest of the public, the courts, and the legal profession. State ex rel. Okla. Bar Ass'n v. Phillips, 2002 OK 86, ¶ 21, 60 P.3d 1030, 1037. This Court administers discipline to deter the attorney from similar conduct in the future and for other attorneys who may consider committing similar acts. State ex rel. Okla. Bar Ass'n v. Townsend, 2012 OK 44, ¶ 31, 277 P.3d 1269, 1279. Discipline is fashioned to coincide with discipline imposed upon other lawyers for similar infractions. State ex rel. Okla. Bar Ass'n v. Mayes, 2003 OK 23, ¶ 25, 66 P.3d 398, 406. However, as this Court strives to be evenhanded and fair in disciplinary matters, discipline is decided on a case-by-case basis taking into account the attorney's unique transgressions and mitigating factors. Id.
¶40 Discipline in attorney misconduct due to neglect ranges from public censure to a suspension of two years and a day. State ex rel. Okla. Bar Ass'n v. Grayson, 2021 OK 58, ¶ 13, 499 P.3d 751, 758. In State ex rel. Oklahoma Bar Association v. Brewer, 1999 OK 101, 998 P.2d 605, John Nathan Brewer was charged with two counts of neglect of client matters and two counts of failure to respond to the OBA's requests to answer formal grievances. Id. ¶ 1, 998 P.2d at 606. The Court held that public censure was appropriate when an attorney is guilty of neglect of a legal matter without affirmative acts of harmful conduct against the client. Id. ¶ 15, 998 P.2d at 610. The Court also ordered Brewer to pay the costs of the action. Id. ¶ 19, 998 P.2d at 759.
¶41 In Sate ex rel. Oklahoma Bar Association v. Hummel, 2004 OK 30, 89 P.3d 1105, there were six counts of professional misconduct asserted against Catheryn Hummel. These counts included lack of communication with clients, showing a lack of competence and diligence, and failure to return an unearned retainer. Id. ¶ 23--25, 89 P.3d at 1111--12. The Court found that a suspension of one year was appropriate in this case. Id. ¶ 26, 89 P.3d at 1112. This was based on Hummel's evidence of depression and continuing treatment. Id. Further, Hummel showed remorse and a wish to cooperate with the OBA. Id.
¶42 In State ex rel. Oklahoma Bar Association v. Jenkins, 2001 OK 54, there were five counts of professional misconduct asserted against Walter Blaine Jenkins. The counts included neglect of clients, lack of communication with clients, charging unreasonable fees, and misrepresenting facts to a federal court. Jenkins admitted these counts by stipulation. In mitigation, Jenkins submitted evidence that he suffered from depression and was in treatment. This Court suspended Jenkins for two years and a day and assessed the costs of the proceedings against him.
¶43 In State ex rel. Oklahoma Bar Association v. Grayson, 2021 OK 58, 499. P.3d 751, Tynan Dasharey Grayson was charged with seven counts of professional conduct resulting from client neglect, neglect in responding to the OBA's investigation, and aggravation from four prior counts of misconduct. Though Grayson admitted to lack of communication with her clients, she blamed her conduct on various medical issues which resulted in anxiety. Id. ¶ 11, 499 P.3d at 757. She was not forthcoming with documentation or information and did not agree that suspension was warranted. Id. This Court suspended Grayson for two years and a day and assessed costs against her. Id.
¶44 There are a total of twenty-two allegations of misconduct asserted against Respondent, and, based on Catholic Charities statement that the twenty cases it listed are just a representative sample, the allegations are too numerous to list. Respondent's actions have lasting consequences. In some cases, the harm is irreversible. Though Respondent admits to some instances of misconduct, his admission does not negate the egregious nature of his violations. While Respondent has asserted that he suffers from mental health issues, he did not provide evidence beyond his testimony substantiating his conditions, nor did he provide any evidence of medical treatment. There is no evidence that these conditions will not affect his performance in the future. Respondent compounded his situation by failing to comply with the OBA's investigation and submit written responses.
¶45 Respondent has no prior discipline. He has expressed remorse for his failure regarding such a vulnerable population. Respondent testified that he reduced the number of clients that he represents and practices only in areas where he feels confident of his abilities.
¶46 Considering the egregiousness of Respondent's conduct, the resulting irreparable harm, the mitigating factors, and the applicable case law, we find that Respondent is suspended from the practice of law for two years and one day.
D. ASSESSMENT OF COSTS
¶47 On November 13, 2023, the OBA submitted an Application to Assess Costs of the disciplinary proceedings in the amount of $3,158.25. Pursuant to RGDP Rule 6.6,
[20] the Respondent is hereby ordered to pay costs in the amount of $3,158.25 within ninety days from the date of this opinion.
E. CONCLUSION
¶48 Respondent's license to practice law is suspended for two years and one day from the date this opinion becomes final. Respondent is further required to pay the assessed costs of this proceeding in the amount of $3,158.25 within ninety days from the date of this opinion.
RESPONDENT SUSPENDED FROM THE PRACTICE OF LAW FOR TWO 
YEARS AND ONE DAY; RESPONDENT ORDERED TO PAY COSTS OF THE 
PROCEEDING.
CONCUR: Winchester, Edmondson, Combs, Gurich, Darby and Kuehn, JJ.
CONCURS IN PART and DISSENTS IN PART: Rowe, V.C.J., Kauger. J.
Kauger, J. with whom Rowe, V.C.J., joins, in concurring in part; dissenting in part:

"I would follow the recommendation of the PRT."

RECUSED: Kane, C.J.
FOOTNOTES
[1] Michael Robert Abdoveis is an attorney who is subject to discipline in SCBD 7522.
[2] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 1.3 states: "A lawyer shall act with reasonable diligence and promptness in representing a client."
[3] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 1.4 states:
(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules; 
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information; and
(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

[4] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 8.1(b) states:
An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
* * *

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6.

[5] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 8.4(a) states: "It is professional misconduct for a lawyer to violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."
[6] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 8.4(d) states: "It is professional misconduct for a lawyer to engage in conduct that is prejudicial to the administration of justice."
[7] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 1.3 states:
The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.
[8] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 5.2 states:

After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall either (1) notify the person filing the grievance and the lawyer that the allegations of the grievance are inadequate, incomplete' or insufficient to warrant the further attention of the Commission, provided that such action shall be reported to the Commission at its next meeting, or (2) file and serve a copy of the grievance (or, in the case of an investigation instituted on the part of the General Counsel or the Commission without the filing of a signed grievance, a recital of the relevant facts or allegations) upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the respondent lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds. Deliberate misrepresentation in such response shall itself be grounds for discipline. The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline. The General Counsel shall make such further investigation of the grievance and response as the General Counsel may deem appropriate before taking any action.

[9] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 1.1 states: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."
[10] Though not specifically listed in its findings of violation, the PRT references 5 O.S. 2021, Ch. 1, App. 3-A, Rule 8.4(c), which states: "It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation."
[11] SIJS is a form of immigration relief available for qualifying immigrant children. If a child is approved as a Special Immigrant Juvenile, the child is eligible to apply for Lawful Permanent Residence which allows the child to legally work in the U.S.; travel outside the U.S.; obtain a social security number, driver's license, or bank account; and is ultimately a path to U.S. citizenship. To be eligible, the child must: (1) be under the age of 21; (2) be currently living in the U.S.; (3) be unmarried; and (4) have a predicate order from a juvenile court that makes a finding that the child is dependent on the court; the child is unable to reunify with one or both parents due to abuse, neglect, abandonment, or a similar basis under state law; and that it is not in the best interest of the child to return to their country of nationality or prior residence. 8 C.F.R. § 204.11(b).
It should be noted that while the federal statute applies to a child under twenty-one, the predicate order in Oklahoma must be obtained by the time the child is eighteen. After the age of eighteen, juvenile courts in Oklahoma lose the ability to adjudicate the predicate orders, so those between eighteen and twenty-one effectively lose the ability to obtain SIJS in Oklahoma.
[12] The administrative closure of removal proceedings does not foreclose the possibility of removal. It simply indicates that the Department of Homeland Security (DHS) is not actively pursuing removal at that time. This status is subject to change and the removal proceedings may be reinstituted by DHS.
[13] Before the PRT, attorney Elizabeth Edwards testified that a U visa--a visa for victims of serious crimes that occur in the United States--is more difficult to obtain and has a potentially decades long wait to obtain relief. SIJS is generally thought to be an easier, more reliable form of relief, so it is significant when that avenue is foreclosed. PRT Hr'g Tr. 77--78, Oct. 10, 2023.
[14] While asylum may be an available form of relief, Elizabeth Edwards testified before the PRT that it is granted at exceedingly low rates. PRT Hr'g Tr. 87--88, Oct. 10, 2023.
[15] A Lozada claim refers to a form of relief that may be available due to ineffective assistance of counsel. Matter of Lozada, 19 I&N Dec. 637 (BIA 1988).
[16] A prerequisite for the application for a provisional waiver is to submit immigrant visa processing fees with the National Visa Center.
[17] In his response, it is believed Respondent misstated his assertion that he admitted conduct in part and denied conduct in part as to L.A.F.O. and M.J.F.E. Respondent admits misconduct as to M.J.F.E. in paragraph 14(e) of his response. He further lists L.A.F.O. and M.J.F.E. as siblings. This is incorrect. L.A.F.O. and M.G.F.O., both referenced in the OBA's complaint, are siblings. As such, it is believed paragraph 14(g) of Respondent's response is meant to address L.A.F.O. and M.G.F.O.
[18] Before the PRT, Catie Coulter testified that Respondent actually filed a guardianship action in this case, not a paternity action. PRT Hr'g Tr. 46, Oct. 10, 2023.
[19] 5 O.S. 2021, Ch. 1, App. 3-A, Rule 3.2 states: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."
[20] 5 O.S. 2021, Ch. 1, App. 1-A, Rule 6.16 states:
The costs of investigation, the record, and disciplinary proceedings shall be advanced by the Oklahoma Bar Association (or the Professional Responsibility Commission, if provision therefor has been made in its budget). Where discipline results, the cost of the investigation, the record, and disciplinary proceedings shall be surcharged against the disciplined lawyer unless remitted in whole or in part by the Supreme Court for good cause shown. Failure of the disciplined lawyer to pay such costs within ninety (90) days after the Supreme Court's order becomes effective shall result in automatic suspension from the practice of law until further order of the Court.

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
2001 OK 26, 23 P.3d 268, 72 OBJ 832, 
STATE ex. rel. OKLAHOMA BAR ASSN. v. BOLUSKY
Discussed

 
2001 OK 54, 27 P.3d 91, 72 OBJ 1942, 
STATE ex. rel. OKLAHOMA BAR ASSN. v. JENKINS
Cited

 
1995 OK 25, 895 P.2d 707, 66 OBJ 1108, 
State ex rel. Oklahoma Bar Assn. v. Holden
Discussed

 
1995 OK 106, 914 P.2d 644, 66 OBJ 3187, 
State ex rel. Oklahoma Bar Assn. v. Eakin
Cited

 
2002 OK 86, 60 P.3d 1030, 
STATE ex. rel. OKLAHOMA BAR ASSN. v. PHILLIPS
Discussed

 
2003 OK 23, 66 P.3d 398, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. MAYES
Discussed

 
2004 OK 30, 89 P.3d 1105, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. HUMMEL
Discussed

 
2009 OK 31, 212 P.3d 1186, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. KINSEY
Discussed

 
2010 OK 67, 240 P.3d 675, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. McCOY
Discussed

 
2012 OK 44, 277 P.3d 1269, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. TOWNSEND
Discussed

 
1999 OK 101, 998 P.2d 605, 71 OBJ 13, 
State ex. rel. Oklahoma Bar Association v. Brewer
Discussed

 
2021 OK 58, 499 P.3d 751, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GRAYSON
Discussed at Length

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA